11 CIV 9646

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

    *Plaintiff*,

-v.-

MAGYAR TELEKOM, PLC, and
DEUTSCHE TELEKOM, AG,

    *Defendants*.

Case No._____

COMPLAINT



Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.    This action arises from multiple violations of the Foreign Corrupt Practices Act of 1977 (the "FCPA") by defendant Magyar Telekom, Plc. ("Magyar Telekom") and corresponding violations of the books and records and internal controls provisions of the FCPA by Magyar Telekom's parent company, defendant Deutsche Telekom, AG ("Deutsche Telekom").

2.    In 2005 and 2006, senior executives then employed at Magyar Telekom, including its Chairman and Chief Executive Officer, organized, approved, and executed a plan to bribe government officials in the Republic of Macedonia to delay or prevent the introduction of a new competitor to Magyar Telekom's subsidiaries operating in Macedonia and to obtain certain regulatory benefits. Magyar Telekom, through its subsidiaries in Macedonia, made payments of €4.875 million during 2005 and 2006 to an intermediary under the guise of bogus "consulting" and "marketing" contracts that did not have any legitimate business purpose. The payments were made with the knowledge,

the firm belief, or under circumstances that made it substantially certain, that all or a portion of the proceeds would be offered, promised or paid to Macedonian government officials. In return, the officials would agree to adopt regulatory changes favorable to Magyar Telekom's business and prevent a new competitor from entering the market. The former executives also offered or promised Macedonian political party officials a valuable business opportunity in return for the party's support of Magyar Telekom's desired benefits.

3. In 2005, the same executives then employed at Magyar Telekom organized, approved, and executed a second corrupt scheme in which they authorized Magyar Telekom and its affiliates to make payments intended to channel and conceal corrupt payments to government officials in the Republic of Montenegro. Magyar Telekom and its subsidiaries in Montenegro made payments of €7.35 million to several third-party consultants under four sham contracts and received no legitimate value in return. These payments were made with the knowledge, the firm belief, or under circumstances that made it substantially certain, that all or a portion of the payments would be offered, promised, or paid to Montenegrin officials to facilitate Magyar Telekom's acquisition of Telekom Crne Gore A.D. ("TCG") on favorable terms.

4. During the relevant period, Magyar Telekom and Deutsche Telekom lacked sufficient internal accounting controls to prevent and detect violations of the FCPA. As a result, the contracts described above were not subjected to meaningful review, and substantially all of the amounts were paid without question, prior to the initiation of an internal investigation at the direction of the Audit Committee of Magyar Telekom.

5. Magyar Telekom recorded the payments to third-parties under these contracts on its books and records in a manner that did not accurately reflect the true purpose of the contracts. The false entries in Magyar Telekom's books and records were consolidated into the books and records of Deutsche Telekom, which reports the results of Magyar Telekom's operations in its consolidated financial statements.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue in this District is proper pursuant to Section 27 of the Exchange Act because acts or transactions constituting federal securities law violations occurred within the Southern District of New York.

8. Magyar Telekom, directly or indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in furtherance of the acts, practices and courses of business described in this Complaint.

9. At all relevant times, Magyar Telekom and Deutsche Telekom were United States issuers that each filed reports on Form 20-F with the Commission pursuant to Section 13 of the Exchange Act.

## DEFENDANTS

10. **Magyar Telekom** is a limited liability stock corporation organized under the laws of Hungary and headquartered in Budapest. Magyar Telekom is the largest telecommunications company in Hungary. Magyar Telekom operates subsidiaries in

Macedonia, Montenegro, and other countries. At all relevant times, Magyar Telekom's securities were publicly traded through American Depository Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE") and registered with the Commission pursuant to Section 12(b) of the Exchange Act. Effective November 12, 2010, Magyar Telekom voluntarily delisted its ADRs from trading on the NYSE.

11.   **Deutsche Telekom** is a private stock corporation organized under the laws of Germany and headquartered in Bonn, Germany. Deutsche Telekom acquired an approximately 60% controlling interest in Magyar Telekom in July 2000 and reports the results of Magyar Telekom's operations in its consolidated financial statements. Deutsche Telekom's shares were publicly traded through ADRs listed on the NYSE and registered with the Commission pursuant to Section 12(b) of the Exchange Act. Effective June 18, 2010, Deutsche Telekom voluntarily delisted its ADRs from trading on the NYSE.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

12.   **Makedonski Telekommunikacii A.D. Skopje ("MakTel")** is the former state-owned telecommunications services provider in Macedonia. In January 2001, Magyar Telekom, acting in a consortium with other bidders, acquired partial ownership of MakTel through a privatization by the Macedonian government. By late 2004, Magyar Telekom had acquired sole ownership of an approximately 51% stake in MakTel by purchasing additional shares from the Macedonian government and from private shareholders. Magyar Telekom now holds its MakTel shares through a wholly-owned holding company. The Macedonian government currently retains an approximately 35% stake in MakTel.

13.     **Telekom Crne Gore A.D. (n/k/a Crnogorski Telekom) ("TCG")** is the former state-owned public telecommunications services provider in Montenegro. In March 2005, Magyar Telekom acquired an approximately 51% interest in TCG from the Government of Montenegro through a privatization. At the same time, Magyar Telekom acquired an additional approximately 22% stake in TCG from minority shareholders.

## FACTUAL ALLEGATIONS

### A.     Violations of the FCPA in Macedonia

14.     During 2005 and 2006, senior executives then employed by Magyar Telekom (the "former executives") offered, promised, authorized and/or paid money or a thing of value to corruptly influence Macedonian government and political party officials in order to obtain their agreement to provide Magyar Telekom with business and regulatory benefits.

15.     The former executives caused Magyar Telekom subsidiaries in Macedonia to pay at least €4.875 million to a third-party under a series of sham marketing and consulting contracts. The former executives knew or firmly believed that the third-party would offer, promise, or pay all or a portion of the payments to government officials in exchange for business and regulatory benefits to Magyar Telekom, or the circumstances were such that made this result substantially certain to occur. They also offered a Macedonian minority political party within the coalition government the opportunity to designate the beneficiary of a business venture in exchange for their party's support of Magyar Telekom's desired benefits.

16.     In early 2005, the Macedonian Parliament enacted a new Electronic Communications Law designed to liberalize the telecommunications market in a manner

that would have been unfavorable to Magyar Telekom. Specifically, among other things, the law authorized the telecommunications regulatory bodies in Macedonia to hold a public tender for a license to operate a third mobile telephone business that would directly compete in Macedonia against Magyar Telekom's subsidiary, MakTel, and imposed increased frequency fees and other regulatory burdens.

17. The former executives devised and executed a plan to corruptly influence government officials from both political parties in Macedonia's coalition government in order to obtain regulatory advantages sought by Magyar Telekom in light of the new law. In approximately May 2005, two of the former executives approved and executed a secret agreement with a senior Macedonian government official to delay or preclude the issuance of a third mobile telephone license and to mitigate the other adverse effects of the new law, including not requiring MakTel to pay the increased frequency fee. In approximately August 2005, two of the former executives approved and executed a similar secret agreement with a senior Macedonian government official from the other political party to obtain the same business and regulatory benefits. The agreements were unlawful under Macedonian law because they were in violation of the recently enacted Electronics Communications Law, required the officials to ignore their lawful duties, and were not properly recorded as official government documents.

18. The Macedonian government officials consented to the agreements after the former Magyar Telekom executives offered to direct separate payments of up to €10 million in three installments between June 2005 and June 2006 to or for the benefit of government officials. Between 2005 and 2006, as Magyar Telekom received the benefits promised in the agreement, the former Magyar Telekom executives authorized

payments by MakTel and other Magyar Telekom subsidiaries of €4.875 million to a Greek intermediary through at least six false "success fee based" contracts for "consulting" and "marketing" services. These contracts were executed with the knowledge or firm belief that some or all of the payments under the contracts would be offered, promised or paid to government officials, or under circumstances that made such a result substantially certain to occur.

19. The only executed copies of the two agreements with the government officials were retained by the Greek intermediary, and the existence and true purpose of the agreements were unknown to anyone within Magyar Telekom and Deutsche Telekom other than the former executives and a small number of additional participants.

20. The former executives structured the contracts with the Greek intermediary for the purpose of circumventing Magyar Telekom's internal controls and avoiding detection. The consulting and marketing contracts entered into in 2005 and 2006 generally were backdated or contained success-based contingencies that had already been satisfied by the time they were executed, and were supported by false performance certificates or other fabricated evidence of performance. The contracts served no legitimate business purpose, and no valuable performance was rendered under them. Instead, the contracts were used to funnel money, which the former executives referred to amongst themselves in code as "logistics," to a third party in circumstances in which the former executives knew, had the firm belief, or in which it was substantially certain that it would be offered, promised or paid, in full or in part, to government officials.

21. In addition, the former Magyar Telekom executives offered a contract for a valuable business opportunity to an entity designated by the minority political party as

part of their effort to secure the benefits sought by Magyar Telekom. Although the contract was executed by one of the former executives, the business opportunity ultimately was not developed.

22. As a result of these payments and offer, the Macedonian government delayed the introduction of a third mobile telephone competitor until 2007, by which time (1) an intervening election had occurred and a new coalition government had obtained control in Macedonia; and (2) the former executives had resigned from Magyar Telekom. Macedonian government officials also unlawfully reduced the frequency fee tariffs imposed on MakTel.

23. Certain electronic communications made in furtherance of the improper payments and the concealment of the payments, including drafts of the agreements with the government officials and the offer to the minority party official, and copies of certain of the contracts with the intermediary, were transmitted by Magyar Telekom employees and others through U.S. interstate commerce or stored on computer servers located in the United States.

24. The payments made under these contracts were recorded on Magyar Telekom's books and records in a manner that did not accurately reflect the true purposes of the contracts under which they were made, and were consolidated into Deutsche Telekom's financial statements. At the time the payments were made, Magyar Telekom and Deutsche Telekom lacked sufficient internal accounting controls to provide reasonable assurances that the transactions were legitimate and recorded appropriately.

### B. FCPA Violations in Montenegro

25. In 2005, the former executives engaged in a scheme to have Magyar Telekom and its subsidiaries corruptly influence government officials in Montenegro in an effort to acquire TCG, the former state-owned telecommunications company. In furtherance of this scheme, Magyar Telekom and its subsidiaries paid €7.35 million under four bogus consulting contracts with the knowledge, the firm belief, or under circumstances that made it substantially certain, that the payments would be offered, promised or paid to government officials in Montenegro to facilitate the TCG acquisition on terms favorable to Magyar Telekom.

26. In October 2004, the Government of Montenegro issued a tender to privatize its approximately 51% stake of the state-owned telecommunications company, TCG. Magyar Telekom submitted a bid that sought to obtain a super-majority ownership stake, consisting of the government's 51% share, plus enough additional minority shares from private investors to give Magyar Telekom ownership of at least two-thirds of TCG. The Board of Directors of Magyar Telekom, in accordance with the decision of the Management Board of Deutsche Telekom, limited the price that Magyar Telekom could pay on a price per share basis for the acquisition. Magyar Telekom's bid for the government shares was conditioned on its ability to acquire the minority shares at the intended valuation.

27. Magyar Telekom prevailed in the public tender process, but the Montenegrin government rejected Magyar Telekom's provision to condition the acquisition upon acquiring a super-majority stake. The share purchase agreement ultimately was executed without this condition.

28.    By March 2005, Magyar Telekom ultimately succeeded in acquiring an approximately 73% stake in TCG on its desired terms, but only after government officials committed the Government of Montenegro to contribute an additional €0.30 per share to the private shareholders.

29.    After the Government of Montenegro facilitated Magyar Telekom's acquisition of shares of TCG from minority shareholders, the former executives caused Magyar Telekom, TCG, and its affiliates to make payments to third-parties with the knowledge, firm belief, or under circumstances that made it substantially certain, that some or all of those payments would be offered, promised or paid to individuals who had been government officials at the time of the TCG acquisition.

30.    Magyar Telekom entered into two nearly-identical contracts with two third-party consultants, purportedly for assistance in purchasing the additional shares from the minority shareholders. The consultants were shell companies based in the Republic of Mauritius and the Republic of the Seychelles that had never before provided services to Magyar Telekom or Deutsche Telekom, and one of the entities was not even legally incorporated when its contract was purportedly signed. Two of the former executives executed the contracts on Magyar Telekom's behalf after Magyar Telekom had already acquired TCG, but backdated the contracts. These contracts concealed the true parties-in-interest and the third-party consultants performed no legitimate services under either of these contracts. Documents purportedly evidencing the consultants' performance under the contracts were fabricated to give the appearance that the consultants rendered legitimate services.

31. The former executives caused Magyar Telekom to make two payments totaling €4.47 million under these contracts between approximately May 12 and May 20, 2005. The former executives of Magyar Telekom either knew or held a firm belief that all or a portion of the payments would be offered, promised or paid to government officials, or circumstances existed that made such a result substantially certain to occur.

32. TCG and a TCG affiliate entered into two additional consulting contracts in 2005 that purported to relate to Magyar Telekom's acquisition of TCG. Both contracts were executed with the knowledge and approval of the former Magyar Telekom executives.

33. One of these contracts purported to require a New York, NY-based counterparty to provide vaguely-identified assistance in connection with the acquisition and integration of TCG into Magyar Telekom's corporate structure. One of the former Magyar Telekom executives signed the contract on behalf of a TCG affiliate and backdated it. The TCG affiliate made payments of €580,000 under this contract.

34. This contract actually was intended to conceal payments made to the sister of a senior Montenegrin government official through a nominee entity identified in the contract. The official's sister did not actually render any bona fide services to Magyar Telekom or TCG under the contract. Magyar Telekom falsely recorded the payments under this contract as a consulting expense on its accounting books and records.

35. The other sham consulting contract was with a shell company based at a residential address in London. Under the contract, the consultant purportedly would provide Magyar Telekom with strategic advice related to the telecommunications market in Southeastern Europe. However, none of the reports provided by the consultant

represented original work. Instead, each report bore a mark on each page identifying the report as the product of another consulting firm. The consultant provided no legitimate services to Magyar Telekom. Although a TCG affiliate paid €2.3 million the consultant between approximately November 7 and December 28, 2005, Magyar Telekom's auditors valued the reports provided at approximately €20,000.

36. These two consulting contracts (1) concealed the true counterparties; (2) did not accurately describe the true services to be rendered; (3) purported to be success based, but were entered into after the relevant contingencies had already been satisfied by other service providers; (4) served no legitimate business purpose, and (5) were supported by false performance certificates or fabricated evidence of performance. The services under these contracts also duplicated services that had previously been provided to Magyar Telekom by known parties for substantially lower prices.

37. The payments under the four contracts described above were recorded on Magyar Telekom's books and records in a manner that did not accurately reflect the true purposes of the contracts under which they were made, and were consolidated into Deutsche Telekom's financial statements. At the time the payments were made, Magyar Telekom and Deutsche Telekom lacked sufficient internal accounting controls to provide reasonable assurances that transactions were legitimate and recorded appropriately.

## FIRST CLAIM FOR RELIEF

### Magyar Telekom Violated
### Section 30A of the Exchange Act

38. Paragraphs 1 through 37 are realleged and incorporated herein by reference.

39. Magyar Telekom, a United States issuer, made use of the mails or other means or instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to a person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office, for purposes of influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence to assist the issuer in obtaining or retaining business.

40. By reason of the foregoing, Magyar Telekom violated Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM FOR RELIEF

### Magyar Telekom and Deutsche Telekom Violated
### Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

41. Paragraphs 1 through 40 are realleged and incorporated herein by reference.

42. Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.

43. Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization; and transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

44. By reason of the foregoing, Magyar Telekom and Deutsche Telekom violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (B)].

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A. Enter a final judgment permanently enjoining Magyar Telekom from violating, or aiding and abetting violations of, Sections 30A [15 U.S.C. §78dd-1], 13(b)(2)(A) [15 U.S.C. §78m(b)(2)(A)], and 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] of the Exchange Act;

B. Enter a final judgment permanently enjoining Deutsche Telekom from violating, or aiding and abetting violations of, 13(b)(2)(A) [15 U.S.C. §78m(b)(2)(A)] and 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] of the Exchange Act;

C. Enter a final judgment ordering Magyar Telekom to disgorge all ill-gotten gains wrongfully obtained as a result of its illegal conduct plus prejudgment interest;

D. Enter a final judgment ordering Magyar Telekom and Deutsche Telekom to pay civil penalties pursuant to Section 21(d) [15 U.S.C. § 78u(d)] and Section 32 [15 U.S.C. § 78ff] of the Exchange Act; and

E.  Grant the Commission such other relief as is just and appropriate.

Dated: December 29, 2011

Respectfully submitted,

_____
Robert I. Dodge (RD-0433)
Kara N. Brockmeyer
Charles E. Cain
Adam J. Eisner

Attorneys for Plaintiff
Securities and Exchange Commission
100 F. Street, NE Washington, DC 20549
Tel: (202) 551-4421 (Dodge)
Fax: (202) 772-9282 (Dodge)
Email: DodgeR@sec.gov